THE PEOPLE'S LAW FIRM, PLC
Stephen D. Benedetto (Ariz. Bar No. 022349)
Heather Hamel (Ariz. Bar No. 031734)
645 North 4th Avenue, Suite A
Phoenix, Arizona 85003
Telephone: (602) 456-1901
Facsimile: (602) 801-2834
benedetto@the-plf.com
hamel@the-plf.com

*Firm email for docketing purposes:*
admin@the-plf.com

*Attorneys for Plaintiff David Saccoccio*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David Saccoccio,<br><br>             Plaintiff,<br><br>     v.<br><br>City of Phoenix, a municipal corporation,<br><br>Jeri Williams, Chief of Police of the City of Phoenix Police Department,<br><br>             Defendants. | Case No.<br><br><br>**CIVIL RIGHTS COMPLAINT (42 U.S.C. § 1983)**<br><br><br><br>(JURY TRIAL DEMANDED) |

For his Complaint against Defendants City of Phoenix and its Chief of Police, Jeri Williams, Plaintiff David Saccoccio, through undersigned counsel, hereby alleges as follows:

## **PARTIES**

1.      Plaintiff David Saccoccio is an unmarried man residing in Maricopa County, Arizona.

2.      Defendant City of Phoenix (the "City") is a municipal corporation created under the laws of the State of Arizona.  The City is under a duty to run its law enforcement activities in a lawful manner to preserve the peace and to preserve for its citizens the rights,

privileges, and immunities guaranteed and secured to them by the Constitutions and laws of the United States and the State of Arizona.

3. The City has established or delegated to its law enforcement agency the responsibility for establishing and implementing policies, practices, procedures and/or customs used by law enforcement officers employed by the City regarding the investigation, detention, arrest, and public relations during law enforcement operations.

4. Every act and omission of the employees, representatives, and agents of the Defendants detailed in this Complaint was performed under the color and pretense of the Constitutions, statutes, ordinances, regulations, customs, and uses of the United States of America, the State of Arizona, and the City of Phoenix, by their authority as sworn officers, and within the course and scope of their employment.

5. Upon information and belief, there are currently unknown City of Phoenix employees who caused or contributed to Plaintiffs' injuries. The identity and roles of these individuals are uniquely within the possession of the City of Phoenix and Plaintiffs will amend this complaint to add such responsible individuals upon discovery of their identities.

6. Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343(a)(3)(4) and 1367(a). This Court has jurisdiction over Plaintiff's claims for violation of Plaintiff's civil rights under 42 U.S.C. § 1983.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that the acts and omissions that give rise to this action occurred within this District and this Court otherwise has jurisdiction.

8. This case presents an actual case in controversy arising under the Fourth and Fourteenth Amendments to the United States Constitution, and under the provisions of 42 U.S.C. §§ 1983 and 1988.

/ / /

**JURISDICTION AND VENUE**

9. Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343(a)(3)(4) and 1367(a). This Court has jurisdiction over Plaintiff's claims for violation of his civil rights under 42 U.S.C. § 1983.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that the acts and omissions that give rise to this action occurred within this District within the appropriate statutes of limitations, and this Court otherwise has jurisdiction.

11. This case presents an actual case in controversy arising under the Fourth, and Fourteenth Amendments to the United States Constitution, and under the provisions of 42 U.S.C. §§ 1983 and 1988.

**GENERAL ALLEGATIONS**

Background of the Dion Johnson / George Floyd Protests

12. On the morning of May 25, 2020, with the country gripped in a global pandemic that was disproportionately impacting and killing black, indigenous, and people of color, a 28-year-old black father named Dion Johnson was asleep behind the wheel of his immobilized vehicle on the Loop 101. A DPS motor officer radioed in that Mr. Johnson was severely intoxicated and non-responsive. Minutes later, apparently without radioing for back-up, the Trooper shot and killed Mr. Johnson.

13. Before the community even had a chance to absorb the news, the earth shook: Social media began the viral circulation of a gruesome video depicting a white Minneapolis police officer kneeling on the neck of a handcuffed black father of two named George Floyd. During the 8 minutes and 46 seconds that the officer knelt on George Floyd's neck, he stared blankly at witnesses and ignored their pleas to stop while three other officers stood by and provided protection to make sure that the crowd could not interfere with the ongoing murder of Mr. Floyd. In the following days, protestors took to the streets to demonstrate in Minneapolis and other American cities.

14. On Thursday, May 28, 2020, peaceful protestors gathered in downtown Phoenix. After several hours, Phoenix Police declared the protest "unlawful" and began shooting the protestors with tear gas and rubber bullets to disburse the crowd. Despite being subject to the deployment of chemical weapons banned for warfare by the Geneva Conventions,[1] no violence was threatened, no participants injured any police offices and all but eight (8) people voluntarily and peacefully left the area. Those eight people were arrested and charged with misdemeanor unlawful assembly.[2]

15. On Friday, May 29, 2020, protestors returned to downtown Phoenix. Again, the protests carried on peacefully for hours. This night there was some destruction to property, although no protest participants or police were injured. Nonetheless, Phoenix Police declared an unlawful assembly and again began shooting tear gas and rubber bullets in an attempt to disburse the protests.

16. On the morning of Saturday, May 30, 2020, Phoenix Mayor Kate Gallego and Police Chief Jeri Williams held a press conference at which they announced that the protests the night before were largely peaceful; that there was a "small" group of protestors who had caused damaged; and that the actions of a "few" had resulted in widespread property damage in the hundreds of thousands of dollars.[3] Phoenix PD made two arrests that night.[4]

17. That evening, protestors again returned to downtown Phoenix. History repeated itself for the third consecutive night: Largely peaceful protests were declared unlawful without and followed by mass deployments of tear gas. This night, however, Phoenix Police decided to change their tactics: Rather than permitting the protestors to

---

[1] https://www.usatoday.com/story/news/factcheck/2020/06/06/fact-check-its-true-tear-gas-chemical-weapon-banned-war/3156448001/

[2] https://www.abc15.com/news/national/rally-underway-in-phoenix-over-the-in-custody-death-of-george-floyd-in-minneapolis

[3] https://www.facebook.com/watch/?v=752671345475649

[4] https://www.abc15.com/news/region-phoenix-metro/central-phoenix/watch-rallies-continue-friday-night-in-phoenix-over-deaths-of-dion-johnson-and-george-floyd

disburse, they chased them down.  Police rounded up and arrested 114 people; detained them for hours in vans and precincts; and eventually booked them into the county jail for the same exact charge (felony rioting).  In support of each of these arrests, Phoenix Police "copied-and-pasted" the same generic probable cause statement – one that, in every case, was constitutionally deficient by the Maricopa County Superior Court.

18.    The next morning, Sunday, May 31, 2020, Phoenix PD announced that it had arrested 114 people in downtown Phoenix for "rioting."  Later that day, citing days of unrest in the City of Phoenix, Arizona Governor Doug Ducey issued an emergency order declaring a "State of Emergency" imposing a curfew beginning at 8 p.m. on May 31, 2020 on all residents, statewide.  Significantly, the emergency order made no exception for exercise of First Amendment Rights.

<u>Plaintiff's Participation in Lawful First Amendment Assembly</u>

19.    On the evening of May 31, 2020, Plaintiff David Saccoccio left his downtown Phoenix apartment to participate in the fourth lawful, peaceful protest that had been planned for that night, as he had the previous three nights.

20.    Mr. Saccoccio joined a group of entirely peaceful protestors – the vast majority of whom were college-aged young people of all races, ethnicities, and backgrounds – who initially assembled at approximately 4th Avenue and Van Buren in downtown Phoenix at approximately 5 p.m.

21.    At this meeting, leaders discussed the importance of keeping this protest peaceful and non-violent, urging all participants to prevent anyone from setting off smoke bombs, fire-crackers, or engaging in any destruction of property.

22.    After approximately thirty minutes, the group began walking to the Phoenix Police Headquarters on 7th Avenue and Washington.

23.    The group protested for approximately two hours outside of police headquarters, without violence or incident, when word began circulating that police would

be closing freeway access to and from downtown Phoenix – causing many attendees to return to their vehicles to ensure that they could get home that evening.

24.     Hundreds of protest attendees remained behind, intent on exercising their First Amendment right to assemble in the face of what they (and many constitutional scholars) believed to be an unconstitutional curfew.

25.     The protest participants began walking as a group, first east to 7th Street before eventually turning north.

26.     The group walked north on 7th Street, crossing Van Buren and approaching Roosevelt Street.  As the group moved north, Phoenix Police presented a massive show of force with officers forming a lengthy riot line across 7th Street cutting off the route.

27.     As the group approached the riot line, protestors began kneeling on the ground with their hands up, peacefully chanting "hands up, don't shoot."  In response, police launched a series of cannisters of tear gas into the middle of the crowd.

28.     Gun shots then started, with helicopters circling overhead, and protestors began getting hit with "less lethal" ammunition like rubber bullets.

<u>Phoenix Police "Corral and Funnel" Tactic</u>

29.     As Mr. Saccoccio and other protestors ran south to evade the pepper spray and onslaught of rubber bullets, they were met with a newly formed riot line of police blocking 7th Street at Van Buren, who began firing tear gas into them from the south.  Chaos then erupted.

30.     With 7th Street blocked to the north and the south, filling up with tear gas, and rubber bullets whizzing through the air, Mr. Saccoccio and other protestors wishing to return home turned to the west – back toward downtown, where they had all come from and where most of them had parked.

31.     As they did so, the protestors saw that police had set up blockades, utilizing police vehicles and barriers to block all roads to the west.

32.     Mr. Saccoccio and other protest attendees were therefore only left with two choices:  Stay in the middle of 7th Street, soaking in tear gas and getting pelted with rubber bullets, or move the only direction that the police had not blocked off – east, into the Garfield historic neighborhood.

Phoenix PD Tactical Teams "Hunt" Attendees

33.     Once in Garfield, the small Phoenix neighborhood bordered by 7th Street to the west and the I-10 to the north, protest attendees were presented with a very different environment than the wide, well-lit public thoroughfares of downtown:  a small urban neighborhood with chain link fences, large block walls, and few operating street lights.

34.     In the neighborhood, Mr. Saccoccio and other protest participants ran from street to street, trying to find their ways back to their vehicles to leave.

35.     As they did so they heard the sounds of helicopters overhead intermingling with constant gunshots, saw the lights of police vehicles racing around them, and saw tactical teams of police officers chasing down protestors and trapping them so that they could tear-gas and shoot them with rubber bullets.

36.     Residents of the neighborhood opened their homes to the scared protestors, trying to protect them from the obvious abuse by police.  As the homes filled up, however, the attendees were merely directed on ways to get out of the neighborhood.

Aggravated Assault on Mr. Saccoccio

37.     At one point, Mr. Saccoccio and his small group saw a group of Phoenix police officers moving toward them.  Against a fence with nowhere to go, they stopped and put their hands up to surrender.

38.     As Mr. Saccoccio attempted to surrender, the officers launched a tear-gas at them.

39. In a desperate attempt to escape the tear-gas, Mr. Saccoccio attempted to scale the fence behind him.

40. After being unable to do so, he turned around, choking on tear-gas and starting to put his hands up to surrender in hopes of being able to leave the area.

41. As Mr. Saccoccio was putting his hands up, he was shot at point-blank range with what felt like a real bullet.

42. Mr. Saccoccio immediately cried out in pain, his arm bleeding profusely, and begged for medical attention.

43. Shortly thereafter, Mr. Saccoccio was advised that a supervising officer had chastised the man who shot him – identified as a "trainee" – for shooting Mr. Saccoccio with a "sandbag" (or beanbag which, upon information and belief, is a "less lethal" form of ammunition commonly used by Phoenix PD).

44. For the next several hours, Phoenix Police officers made fun of Mr. Saccoccio, belittling his injury as "just a scratch" and refusing to get him necessary medical attention despite the degree to which he was bleeding and his reports of intense pain.

45. During this period of time, Mr. Saccoccio sat on a curb, in tears, and listened to Phoenix Police Officers engage in radio traffic with other officers, hearing them compare numbers about how many people they had shot and arrested. He heard them joking callously about people's responses to being tear-gassed and shot with rubber bullets and acting as if the "hunt" for protestors who had been funneled into the Garfield neighborhood was a game to be won by the officers who had assaulted and arrested the most people.

46. Eventually, Phoenix Fire responded to treat Mr. Saccoccio and clean his open wound. After several additional hours, he was brought to a Phoenix Police precinct so that his wounds could be photographed for a use-of-force investigation.

47. Finally, approximately five hours after he was originally shot, Phoenix Police officers brought Mr. Saccoccio to a hospital emergency room for treatment. They dropped

him off, advising him that he would receive a criminal citation in the mail.

48.     Following evaluation by emergency room staff and physicians, David was diagnosed with a fractured radial bone in his arm – an injury so serious it required an emergency surgery the next day.



Figure 1:  David Saccoccio's fractured arm, post-surgery

///

49.     Literally adding insult to injury, the next morning Mr. Saccoccio would read the Phoenix PD's announcement that he was one of over 200 protest attendees who Phoenix Police had tear-gassed, shot with rubber bullets, and funneled into the Garfield neighborhood so they could be hunted for "violating curfew."

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Excessive Force in Violation of Fourth Amendment**
**to the United States Constitution**
**(Against Defendants Williams and Officers To be Named)**

50.     Plaintiff hereby incorporates by reference the allegations contained in the foregoing paragraphs as if they were fully set forth herein.

51.     42 U.S.C section 1983 provides, in relevant part, as follows:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory of the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

42 U.S.C. § 1983.

52.     Plaintiff is a citizen of the United States.

53.     Defendant Jeri Williams, and the unknown officers involved in the excessive use of force against Plaintiff, are "persons" as that term is defined by 42 U.S.C. § 1983.

54.     Defendant Jeri Williams was, at all times relevant hereto, acting under the color of law in her capacity as the City of Phoenix Police Chief; her acts and omissions, as well as those of unnamed officers who directly caused Plaintiff's injuries (who will be named as soon as their identities become known) were conducted within the scope of their official duties or employment.

55.     As the Chief of Police, Defendant Williams undoubtedly was aware of and authorized her officers' use of force at the fourth night of protests in her city.

56. At the time of the complained-of events, the Fourth Amendment to the United States Constitution clearly established Plaintiff's right to be secure in his person from unreasonable seizure through excessive force.

57. At the time of the complained-of events, any reasonable police officer would have known that the Constitution clearly establishes the right of American citizens to be secure in their persons from unreasonable seizure through excessive force.

58. Defendants' actions and use of force – including but not limited to their unnecessary deployment of tear gas (which is prohibited from use in *war* under the Geneva Conventions), their shooting of rubber bullets, and their shooting of Plaintiff in his arm with a beanbag – were objectively unreasonable in light of the facts and circumstances confronting them and violated Plaintiff's rights.

59. Defendants' actions and use of force, as described herein, were also malicious and/or involved reckless, callous, and deliberate indifference to Plaintiff's federally protected rights.

60. Defendants engaged in the above-described conduct willfully, maliciously, in bad faith, with willful indifference to and in reckless disregard of Plaintiff's federally protected constitutional rights, and with conscious awareness that they would cause Plaintiff to suffer physical, emotional, and psychological injuries.

61. Defendants' acts and/or omissions were moving forces behind Plaintiff's injuries, intentionally depriving her of her constitutional rights and causing him other damages.

62. Defendants are not entitled to qualified immunity for the conduct complained of in this Complaint.

63. As a proximate result of Defendants' unlawful and unconstitutional conduct, Plaintiff suffered injuries and other damages and losses as described herein entitling Plaintiff to compensatory, economic, consequential and special damages in an amount to

1   be determine at trial.

2   64.     Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C.

3   § 1988, pre-judgment interest and costs as allowable by federal law.

4   65.     In addition to compensatory, economic, consequential and special damages,

5   Plaintiff is entitled to punitive damages against Defendants under 42 U.S.C. § 1983, in that

6   the actions of these Defendants were taken maliciously, willfully, or with a reckless

7   disregard of Plaintiff's constitutional rights.

8   **SECOND CLAIM FOR RELIEF**
    **42 U.S.C. § 1983 – Municipal Liability under *Monell***
9   **(Against City of Phoenix Only)**

10  66.     Plaintiff hereby incorporates by reference the allegations contained in the

11  foregoing paragraphs as if they were fully set forth herein.

12  67.     Municipal bodies are liable for constitutional violations under 42 U.S.C. §

13  1983 when execution of its official policy or custom deprives an individual of its rights

14  protected by the Constitution.

15  68.     Such municipal liability exists when a city fails to properly train, supervise,

16  or discipline its employees, amounting to a deliberate indifference to a plaintiff's

17  constitutional rights.

18  69.     The Phoenix Police Department has a history of deploying tear-gas as a

19  manner of dispersing protests, despite the fact that the Geneva Conventions expressly

20  prohibit the use of tear-gas and considers it to be chemical warfare.

21  70.     The Phoenix Police Department tactics of attempting to "corral" protestors

22  into confined spaces to permit them to be tear-gassed *en masse*.

23  71.     Upon information and belief, in 2018 Phoenix PD Executive Assistant Chief

24  Mike Kurtenbach traveled to Israel to study how the Israeli military handles Palestinian

25  protestors who they view as "enemy combatants."

26

72.     Upon information and belief, the tactics deployed by Phoenix PD on May 31, 2020 are same tactics that were developed by the Israeli military for use against enemy combatants, and were discussed, implemented, and approved by the highest levels of the Phoenix Police Department.

73.     Additionally, Phoenix PD has a long history of failing to discipline officers for excessive force:  to the extent Phoenix PD fails to discipline its officers for its inappropriate use of tear-gas and shooting of Mr. Saccoccio with a beanbag, it will be liable under *Monell*.

74.     These policies, patterns, practices, and/or customs of condoned misconduct are tacitly or overtly sanctioned by the City of Phoenix, as evidenced by the conduct of the defendants, the City's planning, and the City's anticipated approval of the Phoenix Police Department's $745 million budget today despite a national movement to reallocate police resources to other community uses in light of the epidemic of police misconduct.

75.     The sum of this unconstitutional behavior has been carried out pursuant to policies, patterns, practices, and/or customs, whether formal or informal, which violate the constitutional rights of the Plaintiff and others in Plaintiff's situation.

76.     The condoning of the misconduct, and failure to end these policies, patterns, practices, or customs, was a direct and proximate cause of injuries suffered by Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court enter judgment against Defendants as follows:

    a.  For compensatory damages (general and special) in an amount to compensate Plaintiff fully and fairly for the violations of his Constitutional Rights;

    b.  For nominal damages as provided for by law;

    c.  For punitive damages in an amount sufficient to punish defendants and deter them from similar unconstitutional and unlawful conduct in the future;

1      d.  For prejudgment interest on all liquidated sums;

2      e.  For attorneys' fees under 42 U.S.C. §§ 1983 and 1988;

3      f.  For Plaintiff's costs and other expenses incurred in this action; and

4      g.  Such other and further relief as the Court deems just.

5    DATED this 8th day of June, 2020.

6                                    THE PEOPLE'S LAW FIRM, PLC
                                     645 North 4th Avenue, Suite A
7                                    Phoenix, Arizona  85003

8
                                     By: /s/ Stephen D. Benedetto
9                                        Stephen D. Benedetto
                                         Heather Hamel
10
11                                   *Attorneys for Plaintiff David Saccoccio*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26