SKC

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

David Saccoccio,

                Plaintiff,

v.

City of Phoenix, et al.,

                Defendants.

No. CV-20-01141-PHX-DJH (CDB)

**ORDER**

       Plaintiff David Saccoccio, through counsel, filed this civil rights action under 42 U.S.C. § 1983. Pending before the Court is Defendant City of Phoenix Police Officer Eric Gomez's Motion for Summary Judgment (Doc. 266), which is fully briefed. (Doc. 276, 283). The Court will grant the Motion.

**I.    Background**

       Plaintiff filed this action in July 2020, asserting Fourth Amendment excessive-use-of-force and state law claims against Defendants Officer Gomez, Phoenix Police Chief Jeri Williams, and the City of Phoenix. Plaintiff's claims stem from injuries he allegedly suffered when he was arrested on May 31, 2020 during a fourth night of protests following the deaths of George Floyd and Dion Johnson. The parties have stipulated to the dismissal of all claims except Plaintiff's Fourth Amendment excessive-use-of-force claim against Defendant Gomez ("Defendant"). (*See* Doc. 262.) Defendant moves for summary judgment on this claim, arguing that his use of force was reasonable, and he is entitled to qualified immunity.

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

## III.    Facts

### A.    Defendant Gomez

Defendant Gomez is a member of the Phoenix Police Department's (PPD's) Tactical

Response Unit (TRU), a police field force that responds to protests and riots. (Doc. 266 at 2.) PPD trains TRU officers on protests, riots, crowd control, and unlawful assemblies. (*Id.*) Grenadiers within TRU receive additional training on the use of less lethal munitions and are used as backup for managing potentially dangerous crowds in unlawful assemblies and riots. (*Id.*)

Prior to the events here, Defendant had 34 hours of TRU and Grenadier training, including training on the use of 40-millimeter OC (oleoresin capsicum) impact rounds. (*Id.* at 2−3.) Between May 28 and May 31, 2020, Defendant was part of a four-man mobile Grenadier team led by Sergeant McBride, along with Officers Tate and Bush, and he was equipped with a 40-millimenter less lethal system that deploys 40-millimenter OC impact rounds. (*Id.* at 2.)

### B.    40-Millimenter OC Impact Rounds

A 40-millimenter less lethal system uses a launcher to deploy a frangible (brittle) foam projectile that contains OC powder, an irritant also found in tear gas. (*Id.*; Doc. 276 at 4.) The system is designed to create pain compliance. (Doc. 266-8, McBride Decl. ¶ 8.) Deployment of a 40-millimeter OC impact round bridges the gap between standard, hands-on force and lethal force, where distance is a factor. (Doc. 266 at 3.) When shooting an OC impact round, Grenadiers are taught to aim at the arms, lower abdomen, buttocks, legs, and back. (McBride Decl. ¶ 10.) The effect of being hit is pain, sometimes accompanied by bruising. (*Id.* ¶ 11.)

From 2016 to 2021, Sgt. McBride trained Grenadiers on using the 40-millimeter less lethal system, which included classroom training and practical range exercises to teach officers how to safely use the system. (*Id.* ¶¶ 4−5.) Product specifications for the OC impact rounds state that "frangible impact+ munitions are spin-stabilized projectile[s] and deliver multi-effects of blunt trauma and dispersal of irritant powder on and around [the] target." (Doc. 266-8 at 4.) The specifications caution that "[s]hots to the head, neck, thorax, heart, or spine can result in fatal or serious injury." (*Id.*) PPD's Grenadier training materials warn that the "improper use of chemical or impact munitions" can result in death

or serious injury." (Doc. 276 at 5; Doc. 276-11 at 3.) Prior to Plaintiff's injury on May 31, 2020, Sgt. McBride had never seen or heard of any injury other than bruising caused by an OC impact round. (McBride Decl. ¶ 12.) Defendant also had never seen anything more than bruising and had never known a 40-millimeter OC impact round to cause bleeding or broken bones. (Doc. 266-5 at 33, Def. Dep. at 78.) Lt. Moore has been struck more than once by such rounds from 10−15 yards (30−45 feet) away, and he suffered only bruising. (Moore Dep. at 285.)

### C.    May 2020 Protests[1]

Prior to the May 2020 protests, Defendant attended briefings at the PPD Downtown Operations Unit Office regarding public protests taking place around the country following the death of George Floyd. (Doc. 266 at 5; Def. Dep. at 36:3−37:24.) The officers were informed that, in other major cities, rioters were committing arson, assaulting police with objects and incendiary devices, looting, damaging property, and causing personal injury. (Def. Dep. at 40:3−41:3.) The briefings focused on safety and addressed dangers occurring throughout the country that could occur locally, including arson, criminal damage, assaults, and murders. (*Id.* at 48:25−49:10.)

When preparing for public protests, PPD uses Community Response Squad (CRS) Detectives as its first line, "soft approach" response. (Doc. 266 at 4.) CRS Detectives meet in advance with protest organizers to coordinate and facilitate peaceful First Amendment demonstrations. (*Id.* at 4−5; Moore Dep. at 278.) During protests, CRS Detectives act as plain-clothes observers and do not participate in enforcement actions, and

---

[1] Plaintiff asks the Court to disregard and strike Defendant's facts from the initial TRU briefings through the first three nights of demonstrations from May 28−30, 2020, arguing that they are irrelevant because they occurred prior to Defendant's use of force on May 31, 2020. (Doc. 276 at 3.) The Court denies this request. The events of the three nights leading up to the use of force provide context, and they factor into the totality of the circumstances that inform what a reasonable officer in Defendant's position could have concluded about the need for force on May 31st. The Court has, however, limited its recitation of these facts accordingly and has excluded from its analysis any facts about Plaintiff's prior actions that would not have been known to Defendant.

TRU officers are staged out of sight and only used if necessary. (Doc. 166 at 5.) If a protest ceases to be peaceful, CRS may broadcast a pre-recorded unlawful assembly order from a Long-Range Acoustic Device (LRAD) mounted on utility vehicles, calling on participants to disperse. (Doc. 266 at 5.) Officers may also use a PA system attached to an LRAD to make live announcements for public safety reasons. (*Id.*) The goal of these announcements is to stop the violence and disperse participants without arrests. (*Id.*) When a protest ceases to be peaceful, the Field Force Commander/Alpha Leader (here, Lt. Moore) may deploy TRU officers to form a skirmish line—a physical line of officers standing shoulder to shoulder—to contain protesters in a particular area, or in cases of active violence, utilize Grenadiers to deploy appropriate munitions. (*Id.*)

On May 28, 2020, the first night of scheduled demonstrations in Phoenix, the protests began peacefully, with minimal police response. (*Id.* at 4.) After dark, the crowds changed, and protesters occupied city streets and gathered in front of the PPD Headquarters at 620 West Washington Street. (*Id.* at 5−6.) At least one protester dumped pieces of rock/concrete from a bucket onto the street, and some individuals picked these up and threw them towards the police station while yelling profanities at the police. (*Id.*; Doc. 266-4, Video Ex. 3 at 1:18−47; Video Ex. 4.) The crowd ignored repeated LRAD announcements declaring an unlawful assembly and ordering them to disperse. (*Id.*)

Later, vehicles intermixed with the crowds in the streets to offer cover, support, and hydration. According to Lt. Moore, this had never happened in prior Phoenix protests and it made the situation "extremely dangerous." (Doc. 266 at 6; Moore Dep. at 276:14−277:9.) Moore explained that a vehicle is a "multi-ton avenue of hurting people, possibly," the officers do not know who is inside or their intent, and "[i]t's a very difficult task for us to be able to keep them from injuring someone when they're in close formation with any type of crowd." (*Id.*) Vehicles can also be used to conceal weapons, and in several vehicle stops during the May protests, the occupants had firearms. (*Id.*)

Over the next two nights, events followed a similar pattern, with plain clothes CRS Detectives monitoring what began as largely peaceful protests, while later in the night, the

protests became violent.  (Doc. 266 at 7–16.)  PPD intelligence officers provided daily briefings during this time, and they informed TRU officers that agitator groups were communicating threats on azriots.com to come out to the protests to riot.  (*Id.* at 8; Moore Dep. at 279–80.)  On May 29, 2020, ABC15 TV documented protesters throwing water bottles at police officers, including one that struck an officer in the face, and Fox10 TV documented protesters committing vandalism, arson, and knocking down barricades. (Doc. 266 at 7.)  Citizen video also captured protesters breaking the federal court building windows while others cheered, shouted profanities at police, and refused to disperse despite repeated LRAD unlawful assembly orders.  (*Id.* at 7–8.)  Protesters forced their way into the Phoenix City Court building and ignited fireworks inside the lobby. (*Id.*) A group of protesters moving eastbound from that location vandalized an entire line of police Tahoe trucks, including by using fireworks and setting fire to the backseat of one of the Tahoes. (*Id.* at 8.)  Defendant testified from his own experience that:

> officers were being assaulted, water bottles were being thrown at us, frozen water bottles, candles, incendiary devices such as fireworks tied with change and different metal objects to try, I believe, to cause shrapnel upon exploding; damage of property, spray painting on property, our front windows of our police headquarters being busted out, people trying to light things on fire, trying to light different things on fire, trees, businesses, different stuff like that.  So we seen a lot of different things going on.

(Def. Dep. at 158:2–12.)

The next night, May 30, 2020, CRS detectives again worked with protest organizers to facilitate a safe protest that would largely take place off the streets.  (*Id.*)  Later that night, large groups began occupying and obstructing streets, blocking in vehicles, and hundreds of people and some vehicles continually looped around the PPD Headquarters. (*Id.* at 8–10.)  At one point, groups of protesters began launching projectiles at police officers who, along with Lt. Moore, were standing in a line formation in front of the police station.  (*Id.* at 11; Moore Dep. at 280–81.)  The projectiles included hard rubber bullets, which were striking the officers and bouncing off the building, and various incendiaries,

including commercial fireworks.  (*Id.*)  Another large crowd marched east on Jefferson Street, breaking windows, and used a truck-mounted flame thrower and other, smaller flame throwers to try to light things on fire.  (*Id.*)

Based on these and other acts of rioting, at 10:43 p.m. that night, Lt. Moore authorized TRU Grenadiers to deploy munitions.  (Doc. 266 at 13.)  Similar criminal conduct continued for several more hours in various places in downtown Phoenix, including at 12:45 a.m., when Lt. Moore and a group of skirmish line officers responded to multiple reports of criminal activity near Talking Stick Arena, where rioters broke down construction fencing and started fires. (*Id.* at 13−14.) Elsewhere, large groups of protesters intermixed with vehicles, some of which were driving with doors open or going the wrong way on the streets.  (*Id.* at 14−15.)  At one point, two officers following a group of protesters at 15th Avenue and Van Buren radioed that their Tahoe had been hit by a large rock, significantly damaging the rear passenger side window, and while the officers followed the group, protesters continued to throw rocks at the Tahoe. (*Id.* at 15.) At around 2:00 a.m., as patrol officers were making traffic stops, protesters shouted at the officers and threw rocks at them, despite verbal orders to "leave" and "go." (*Id.* at 15−16.) Protest support vehicles drove dangerously over curbs, and one vehicle refused to stop for police and recklessly raced off into the street, which was crowded with protesters.  (*Id.*)

### D.    May 31, 2020 State Emergency Declaration and Curfew

On May 31, 2020, following three days of "civil unrest," Arizona Governor Doug Ducey signed a Declaration of State Emergency, imposing a daily curfew, effective Sunday, May 31, 2020 from 8:00 p.m. to 5:00 a.m. the next day and continuing each day through June 8, 2020.  (*Id.* at 16.)  The curfew required everyone to be off the public streets and sidewalks, starting at 8:00 p.m. each night.  (*Id.*)

At 7:30 p.m. on May 31, 2020, the scheduled demonstration in downtown Phoenix ended 30 minutes before the start of curfew, but a large group of people, including Plaintiff and his companion Rebekah Young, who was videorecording and livestreaming on Instagram, stayed in the area and began marching down the street.  (Doc. 266 at 16−17;

Doc. 266-3 at 52, Young Dep. at 76:2−21.)  The group continued marching after curfew, gathering other people to join them.  (Doc. 266 at 18.)  About 51 minutes past curfew, Young announced on video that they were ready to get tear gassed, and the group charged at police officers who were blocking their access to the freeway, and the protesters were tear gassed.  (*Id.* at 18−19.)  As on previous nights, protesters were setting off fireworks and smoke bombs, and vehicles intermixed with the protesters and handed out water bottles.  (*Id.* at 19.)

About one hour after curfew, Young, while in front of a Circle K on Roosevelt, proclaimed on video that "everything's just changed" and said that a protester smashed something into a Jimmy John's window.  (*Id.*)  As Young spoke, a protester walked by carrying a baseball bat while other protesters set off fireworks and threw objects at police.  (*Id.*)  The Air Unit reported to TRU Officers the locations of the protesters, who had split into two groups, with one group headed southbound behind the Circle K on 7th Street, while another large group was just east of the Circle K on Roosevelt.  (*Id.*)  At 8:59 p.m., Grenadiers were called to 7th Street and Roosevelt after police units reported, "the crowd's getting crazy."  (*Id.*)

Defendant responded to this scene, which he characterized as "a riot . . . where officers were assaulted, property was damaged."  (Def. Dep. at 121:3−16.)  DPS officers deployed tear gas on rioters trying to gain access to the freeway, and several officers, including Defendant "fired on targets who were trying to the assault the police."  (*Id.*)  In addition to these incidents, Defendant knew from radio transmissions that multiple groups were going through the streets, with a large group "splitting up and then still agitating . . . climbing into people's yards . . . damaging property, doing different things, running, evading, running."  (*Id.* at 121:25−9.)

After 9:00 p.m., an hour after the curfew began, a splinter group from the group that had gathered at 7th Street and Roosevelt continued marching southbound on 9th Street, periodically turning into side streets to evade police.  (*Id.*)  At one point, the group ran down an alley, and the Air Unit reported to TRU officers on the ground that the group "ran

1    down the alley, and now they're gonna go eastbound." (*Id.* at 20−21.)

2        **E.**    **Use-of-Force Incident**

3           Around this time, the Air Unit observed a white pickup truck picking up rioters, and

4    officers were instructed over the radio to "arrest as many people as you can." (*Id.*) At

5    approximately 9:15 p.m., Defendant's four-man Grenadier team, consisting of Sgt.

6    McBride, Defendant, and Officers Tate and Bush, stopped the white pickup truck, with six

7    occupants, at 11th Way and Polk Street. (*Id.* at 21.)

8           After the Grenadier team stopped the truck, the Air Unit stated something like,

9    "officers out with the white truck[,] there's several people running through an alley coming

10   right at you." (Doc. 266 at 21; Def. Dep. at 109:9−15.) Upon hearing this, Defendant

11   feared for his safety and the safety of his fellow officers because he was "out with six

12   individuals who were not searched yet in a vehicle that presented a lot of dangers to us . . .

13   I had no idea what they were doing, what their intent was, what they had and all that." (*Id.*

14   at 111:21−112:10.) The occupants of the truck outnumbered the officers, and Defendant

15   feared the individuals coming toward them from the alley might try to help those in the

16   truck get away. (*Id.* at 112:12−23; Doc. 266 at 22.)

17          Through his peripheral vision, Defendant saw a group of 4 to 5 people running

18   towards him, but he did not focus on them until he heard Officer Tate give several

19   commands to stop, and he heard pepper balls being shot. (Def. Dep. at 93:21−95:17,

20   109:24−110:20.) Defendant turned away from the individuals at the traffic stop and for

21   the first time saw Plaintiff climbing a fence bordering a residential yard. (*Id.*) Plaintiff

22   was about 25 feet deep into the alley, and Defendant was about 100 feet from Plaintiff on

23   the opposite side of the street with "six people proned out" from the traffic stop. (*Id.* at

24   350:19−23, McBride Dep. at 289:1−5.) Defendant did not hear Plaintiff say anything or

25   see him engage in any acts of violence, and he did not see Plaintiff with any weapons or

26   incendiary devices, but he observed that Plaintiff had a backpack. (Def. Dep. at

27   93:19−95:17.) Defendant focused his attention solely on Plaintiff who was trying to reach

28   the other side of the residential fence, and he fired a single OC impact round at the lower

right side of Plaintiff's torso.  (*Id.* at 116, 128.)  Plaintiff was hit and fell to the ground.  (*Id.* at 128.)  Defendant saw Officer Tate and Officer Bush approach Plaintiff and the other suspects in the alley and issue commands, so Defendant returned to the suspects at the traffic stop.  (*Id.* at 128:21−129:4.)  The officers brought the suspects from the alley to the traffic stop, and Defendant saw that Plaintiff's arm was bloody, so he called the fire department.  (*Id.* at 129:8−130:15.)  The Grenadier Unit was then called to another location, so Defendant did not spend any more time with Plaintiff.  (*Id.* at 130:18−22.)

Officer Tate's police report of the incident notes a group of 5 or 6 people were running south in the alley toward the traffic stop, and Officer Tate commanded them to stop and fired pepper ball rounds at their feet and legs because they failed to comply.  (Doc. 276 at 5; Doc. 276-15 at 2.)  Two people tried to jump a fence into a residential yard, and Defendant deployed an OC impact round that hit the forearm of one person (Plaintiff), who "immediately got off the fence and became compliant."  (Doc. 276-15 at 3.)  Afterward, "the subject that sustained the impact to his forearm complained of injury.  The impact site was bleeding a little bit.  [Defendant] radioed for paramedics to respond to evaluate the injury," and other officers took custody of all the subjects to free the Grenadier team to assist other units needing Grenadier support.  (*Id.*)[2]

---

[2] In addition to this report, Plaintiff proffers a "Use of Force Report" that he claims was "authored by employees of the Phoenix Police Department" and "explains the Department's understandings regarding Defendant Gomez's use of force against Plaintiff Saccoccio."  (Doc. 276 at 7; Doc. 276-6.)  Defendant objects to the use of this report, arguing Plaintiff provided no foundation for it and it is inadmissible hearsay.  (Doc. 283 at 6.)  The Use of Force Report is not signed, though Defendant asserts it was authored by Brian Bachorski, who is listed as the "Supervisor" on the first page of the report.  (*Id.*; Doc. 276-6 at 2.)  Defendant argues there is no evidence Bachorski had any first-hand knowledge of what transpired during Defendant's use of force against Plaintiff, and there is no evidence how Bachorski obtained the information he used to make the report.  (Doc. 283 at 6.)

The Court will disregard this report.  *See Colvin v. United States*, 479 F.2d 998, 1003 (9th Cir. 1973) ("Entries in a police report based on an officer's observation and knowledge may be admitted, but statements attributed to other persons are clearly hearsay, and inadmissible under the common law exception to the hearsay rule"); *see also* Fed. R. Civ. P. 56(c)(4) (requiring an affidavit or declaration used to support or oppose a motion for summary judgment to be based on personal knowledge).  Even if the Report were

1

2      **F.      Bodycam Video**

Officer Tate's bodycam video shows officers at the start of the traffic stop yelling

3  at the occupants of the white pickup truck, "don't move!" and "turn the engine off, now!"

4  (Doc. 268-1, Video Ex. 79 at 16:28)  Defendant's bodycam shows the occupants, including

5  several seated in the open truck bed, with their hands raised while the officers yell, "don't

6  move."  (Video Ex. 75 at 4:17−55.)  Over the next 30−45 seconds, the officers remove the

7  individuals from the truck and place them face-first against the sides of the truck or order

8  them to lie on their stomachs on the ground and "be quiet!"  (*Id.*)  Over this time, the Air

9  Unit reported things like, "this group here with the pickup truck, its got . . . a large group,"

10 and "there's about 20 coming toward you right now."  (*Id.*)

11     Neither officers' bodycam gives a clear or steady view of the alley or the individuals

12 coming toward the traffic stop.  Officer Tate's bodycam is mostly blacked-out or in motion

13 during the encounter, but Officer Tate can suddenly be heard yelling in an urgent voice,

14 "stop, stop right there, stop right there!" and repeating this several times before clicking

15 noises can be heard, indicating Officer Tate started to fire pepper balls.  (Video Ex. 79 at

16 4:17:47−51.)  After a short burst of clicking noises followed by about a two-second pause,

17 Officer Tate again yells, "stop," and "get on the ground, get on the ground!"  (*Id.* at

18 4:17:51−58.)  After more clicking sounds, another officer says, "I'm moving up with you."

19 (*Id.* at 4:17:58−4:18:07.)  Officer Tate then walks forward and yells, "hands up! hands up!"

20 (*Id.* at 4:18:07−13.)  A figure can briefly be seen scrambling up from the ground, saying,

21 "I'm fine," then walking ahead of the officers toward the street with his hands raised.  (*Id.*

22 at 4:18:07:13−30.)

23     **G.      Plaintiff's Injuries**

24     Fire department employees attended to Plaintiff at the scene and bandaged his arm.

25

26 admissible, the Court would reject it because it merely contains checklists pertaining to the
   author's assessment of the need for force and the amount and type of force used without
27 any narrative of events or facts supporting its "checkbox" conclusions.  Thus, the report is
   merely conclusory and adds nothing to the Court's required use-of-force analysis, which
28 must be based on the facts known to the officers at the time.

(Doc. 266 at 26.)  Afterwards, PPD officers transported Plaintiff to a PPD precinct to photograph his arm and then to the Phoenix Good Samaritan Hospital.  (*Id.*)[3]  The next day, Plaintiff went to Banner University Medical Center ("Banner").  (Doc. 276-13 at 2.)  Medical records from Banner show Plaintiff had an open wound of about 1.5 cm that "appeared to be an outside-in injury," which probed down to the bone, causing an "undisplaced fracture of the radial shaft."  (*Id.* at 5.)[4]  Surgeon Niloofar Dehghan, MD, performed open reduction and internal fixation surgery and inserted a small metal plate to the bone.  (*Id.*)

Plaintiff's medical expert, Dr. Jeffrey Yao did not opine on the cause of Plaintiff's injury but stated "the record of Mr. Saccoccio's visit to the emergency department and throughout the remainder of his treatment establishes this as a blunt force trauma caused by [a] 'rubber bullet' presumably traveling at high velocity."  (Doc. 276-7 at 3.)  Dr. Yao appears to rely on Banner's intake notes, which identified Plaintiff's "chief complaint" as having been "shot with a rubber bullet tonight – has wound to right forearm with pain and swelling."  (Doc. 276-13 at 2.)

**IV.    Fourth Amendment Legal Standard**

A claim that law enforcement officers used excessive force during an arrest is analyzed under the Fourth Amendment and its "reasonableness" standard.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  This inquiry requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests."  *Id.*

---

[3] Plaintiff claims hospital staff "determined [he had] a non-displaced comminuted fracture of the shaft of the radius in his right arm" (Doc. 276 at 8), but the evidence he cites (Doc. 266-2, Pl. Dep. at 116) does not contain this information or any facts about what took place at the hospital that night.  Defendant's facts regarding Plaintiff's injuries are also unsupported by the cited evidence.  (Doc. 266 at 26.)

[4] Defendant claims Plaintiff was diagnosed with HIV in 2009 and at one time took medications that, along with HIV, are known to reduce bone mineral density.  (Doc. 266 at 28.)  Defendant does not cite to any identifiable evidence for these facts.

1        To determine whether a Fourth Amendment violation has occurred, the court
2  conducts a three-step analysis assessing (1) the nature of force inflicted; (2) the
3  governmental interests at stake, which involves assessing factors such as the severity of the
4  crime, the threat posed by the suspect, and whether the suspect is resisting arrest (the
5  "*Graham* factors"); and (3) whether the force used was necessary.  *Espinosa v. City &*
6  *Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396−97; *Miller*
7  *v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)).

8        "The reasonableness of a particular use of force must be judged from the perspective
9  of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."
10  *Graham*, 490 U.S. at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20−22 (1968)).  This is
11  because "[t]he calculus of reasonableness must embody allowance for the fact that police
12  officers are often forced to make split-second judgments—in circumstances that are tense,
13  uncertain, and rapidly evolving—about the amount of force that is necessary in a particular
14  situation." *Graham*, 490 U.S. at 396−97.

15        At the summary judgment stage, once the court has "determined the relevant set of
16  facts and drawn all inferences in favor of the nonmoving party to the extent supportable by
17  the record,"  the question of whether an officer's actions were objectively reasonable under
18  the Fourth Amendment is a "pure question of law."  *Scott v. Harris*, 550 U.S. 372, 381 n.8
19  (2007).  But an officer is not entitled to summary judgment if the evidence, viewed in the
20  nonmovant's favor, could support a finding of excessive force.  *Smith v. City of Hemet*,
21  394 F.3d 689, 701 (9th Cir. 2005).  Because the excessive force balancing test is "inherently
22  fact specific, the determination whether the force used to effect an arrest was reasonable
23  under the Fourth Amendment should only be taken from the jury in rare cases."  *Green v.*
24  *City and Cnty. of S.F.*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks
25  omitted); *see Smith*, 394 F.3d at 701 (excessive force cases often turn on credibility
26  determinations, and the excessive force inquiry "nearly always requires a jury to sift
27  through disputed factual contentions, and to draw inferences therefrom") (quotation
28  omitted).

Where the evidence includes video footage, the Court considers the facts in the light depicted by the video but still draws all inferences from the video in Plaintiff's favor. *See Scott*, 550 U.S. at 380–81 (a court may properly consider video evidence in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape"); *Williams v. Las Vegas Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007)). However, if a party's asserted facts clearly differ from the facts in the video, the Court must consider the facts as depicted by the video. *See Scott*, 550 U.S. at 380 ("[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

## V.    Discussion

Defendant argues his use of force consisted of less lethal pain compliance and was objectively reasonable based on the totality of the circumstances known to him at the time. (Doc. 266 at 31−41.)

### A.    Nature of Force Used

The Court must first assess the nature of the force used. *Espinosa*, 598 F.3d at 537; *Graham*, 490 U.S. at 396−97; *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994) ("To assess the gravity of a particular intrusion on Fourth Amendment rights, the factfinder must evaluate the type and amount of force inflicted."). Defendant argues that the force used was minimal because the OC impact round he used inflicts pain and can result in bruising but does not typically cause any significant injuries, even when fired from within 30−45 feet away. (Doc. 266 at 33−34.)

Defendant likens the force used to the "pain compliance techniques" in *Forrester v. City of San Diego*, 25 F.3d 804, 805 (9th Cir. 1994). In *Forrester*, police responded to

anti-abortion protesters blocking employee and patient access to healthcare clinics. (*Id.*) The officers issued verbal warnings to leave, then arrested those who remained, and finally removed by force everyone who passively refused to move, either by applying nunchakus (two sticks connected by a cord, used to grasp and tighten around a demonstrator's wrists) or direct physical contact, such as firm grips, wrist- and arm-twisting, and pressure point holds. *Id.* The Ninth Circuit described these pain compliance measures as "less significant than most claims of force," such as deadly force, physical blows, or cuts, and found such force was objectively reasonable to remove the passively resistant protesters. *Id.* at 807.

Plaintiff argues that Defendant's use of force was more severe than the "pain compliance technique[s]" in *Forrester* because there is no evidence the nunchakus and direct physical force the officers used in that case could cause serious injury or death. (Doc. 276 at 11.) In contrast, Plaintiff cites to the opinion of his use-of-force expert, Lon Bartel, that the OC impact round Defendant used "is not just a chemical weapon delivery system; it is a kinetic energy projectile that can cause severe injury or death due to it impacting the human body." (Doc. 276-5 at 14.)[5] Plaintiff also cites to Defendant's deposition testimony that he was trained to shoot from at least five feet away and only at target areas, not the head or neck. (Def. Dep. at 81:3−82:4.) Defendant explained that avoiding the head was to avoid injury, such as the loss of an eye or breaking a tooth or "just avoid the head . . . for obvious reasons." (*Id.*) Defendant also stated PPD does not permit the use of such munitions in a blanket fashion against rioters and that doing so would violate his training. (*Id.* at 65:1−10.) The manufacturer's specifications for these munitions state that "[s]hots to the head, neck, thorax, heart, or spine can result in fatal or serious injury," and PPD's training materials warn that the "improper use of chemical or impact munitions" can result in death or serious injury. (Doc. 266-8 at 4; Doc. 276 at 5; Doc. 276-11 at 3.) Based on these statements, Plaintiff argues that "[t]he 40-millimeter

---

[5] Defendant objects to this opinion as beyond the scope of Bartel's expertise. Because Bartel's opinion is general and conclusory and does not add to the facts already in evidence about this use of force, the Court need not address Defendant's objection.

impact round . . . is not a benign 'pain compliance technique.' Instead, it is a serious, potentially lethal munition," and its potency and potential lethality "weighs against Defendant's use of force." (Doc. 276 at 4.)

When used improperly, an OC impact round can cause serious injury and/or death. *See*, *e.g*, *Marks v. Bauer*, No. CV 20-1913 ADM/JFD, 2023 WL 1478015, at *7 (D. Minn. Feb. 2, 2023), *aff'd,* 107 F.4th 840 (8th Cir. 2024) (officer "used force capable of causing serious or fatal injury" when he fired a direct impact OC round into a protester's face from point-blank range, rupturing an eyeball and causing a traumatic brain injury). But this does not characterize the nature and amount of force used here. Plaintiff does not argue that Defendant ignored his use-of-force training or manufacturer specifications for this type of force, such as by firing indiscriminately or at close range or by aiming at or hitting any areas of Plaintiff's body, such as the head, neck, chest, or spine, that can cause serious injury or death. It is undisputed Defendant shot at Plaintiff from 100 feet away, well more than the 5-foot minimum, and he targeted Plaintiff's lower right side and hit his right arm, both acceptable target areas where such force typically causes only pain and bruising.

Courts have found that "the extent of injury may . . . provide some indication of the amount of force applied," *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010), and "the severity of the injuries may support the inference that the force used was substantial." *Santos v. Gates*, 287 F.3d 846, 855 (9th Cir. 2002). *Santos* involved an officer's hands-on use of force to tackle a burglary suspect, wherein the parties materially disputed the amount of force used. 287 F.3d at 848−50. The suspect (Santos) only remembered two officers running towards him then hearing a loud sound and feeling pain so intense he passed out. *Id.* at 848. Before passing out, Santos said he screamed, "Why did you have to break my back?" and the lower portion of his back felt like it was "on fire." *Id.* The medical evidence confirmed Santos had a compression fracture of his L-2 vertebra. *Id.* at 850. The officer stated he merely "guided" Santos to the ground and Santos's buttocks touched the ground first. *Id.* at 849. Since the amount of force used was disputed but the extent of injury was severe, the Ninth Circuit opined that "a jury could reasonably draw the inference that the use of force

1    sufficient to break Santos's back was far more intrusive." *Id.* at 855.

2          As in *Santos*, Plaintiff's arm fracture requiring surgery and the insertion of a metal

3 plate was a serious injury. There is also no genuine dispute that the OC impact round

4 caused Plaintiff's injury.[6] Unlike in *Santos*, though, where the amount of hands-on force

5 the officer used to take Santos to the ground was materially disputed, there is no doubt

6 about the quantum of force used here. It is undisputed Defendant shot Plaintiff in the arm

7 with an OC impact round from 100 feet away. It is also undisputed that this type of force,

8 when aimed at a subject's arms, legs, or lower torso, as was done here, is designed to cause

9 pain on impact and result in only minimal injury. *See Byrd v. Serrano*, No.

10 119CV01343ADAHBKPC, 2022 WL 11313955, at *6 (E.D. Cal. Oct. 19, 2022), *report*

11 *and recommendation adopted,* No. 119CV01343ADAHBKPC, 2022 WL 17598845 (E.D.

12 Cal. Dec. 13, 2022) ("The 40-millimeter launcher fires a direct-impact, less lethal sponge

13 round, an individual foam projectile designed to cause minimal injury"); *Marks*, No. CV

14 20-1913 ADM/JFD, 2023 WL 1478015, at *3 (internal citations omitted, alterations in

15 original) ("The launcher fires 40-millimeter high energy munitions designed to cause pain

16 and to leave[ ] the body surface intact, but cause[ ] sufficient injury to incapacitate the

17 subject.")

18          Plaintiff's injury, though more severe than typical for this type of force, does not

19 transform Defendant's use of force into something other than a single, correctly deployed

20 40-millimenter OC impact round. This use of force, like the pain compliance techniques

21 in *Forrester*, was "less significant" than severe or deadly force. 25 F.3d at 807. Construed

22 _____

23        [6] Defendant argues based on expert opinion evidence that Plaintiff's injury could

24 have been caused by one of three things: (1) "contact to his right forearm from the impact round," (2) "falling and sustaining a direct impact to his right forearm upon landing," or

25 (3) "falling from the fence and bracing his fall with his right hand." (Doc. 266 at 27.) Defendant did not include or properly cite to the expert report he relies on for this opinion.

26 In any case, there is no genuine dispute that, whatever the modality, Plaintiff's injury would not have occurred but for Defendant's use of force. Moreover, even if Defendant had

27 produced sufficient evidence to create a genuine issue of material fact whether Defendant's

28 use of force proximately caused Plaintiff's injury, the Court must resolve all genuine disputes of material fact in Plaintiff's favor at this stage.

1    in Plaintiff's favor, Defendant used minimal to moderate force.

2          **B.     Government Interest**

3          In evaluating the government interest at stake, the Court considers the severity of

4    the crime, the threat posed by the suspect, and whether the suspect resisted arrest or

5    attempted to flee.  *Graham*, 490 U.S. at 396−97.  "These factors, however, are not

6    exclusive. . . . we examine the totality of the circumstances and consider whatever specific

7    factors may be appropriate in a particular case, whether or not listed in *Graham*."  *Bryan*

8    *v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010).

9          Defendant argues there was a strong government interest at stake because cities have

10   a significant interest in dispersing lawbreakers and restoring order; the crimes at issue

11   included riot, criminal trespass, violation of an emergency curfew order, and obstructing

12   police; Plaintiff posed an immediate threat to police and others; and Plaintiff was actively

13   attempting to evade arrest by flight.  (Doc. 266 at 34−38.)

14         **1.     Government Interest in Restoring Order**

15         The government has a legitimate interest in dispersing lawbreakers and restoring

16   order.  *Felarca v. Birgeneau*, 891 F.3d 809, 818 (9th Cir. 2018) (citing *Forrester*, 25 F.3d

17   at 807).  In *Forrester*, the Ninth Circuit found that, where more than 100 protesters engaged

18   in a concerted effort "to invade private property, obstruct business, and hinder law

19   enforcement," the government "clearly had a legitimate interest in quickly dispersing and

20   removing lawbreakers with the least risk of injury to police and others."  25 F.3d at 807.

21   Even though many of the crimes were misdemeanors, the court found that "the city's

22   interest in preventing their widespread occurrence was significant."  *Id.* (quoting *Bray v.*

23   *Alexandria Women's Health Clinic*, 506 U.S. 263, 287 (1993) (Kennedy, J., concurring)

24   ("Even in the context of political protest, persistent, organized, premeditated lawlessness

25   menaces in a unique way the capacity of a State to maintain order and preserve the rights

26   of its citizens.").

27         Plaintiff does not dispute that the City was under a statewide curfew due to three

28   nights of civil unrest.  Nor does he dispute that, in the hour between the start of curfew and

1    his arrest, large groups had taken to the streets after mostly peaceful protests and, like

2    previous nights, engaged in lawless activities, including property damage and assaults on

3    police with rocks and water bottles.  There was, therefore, a significant government interest

4    at stake in dispersing the crowds who defied the curfew order which intended to restore

5    order to the area.  *Forrester*, 25 F.3d at 807; *Bray*, 506 U.S. 263, 287.

6                            **2.      Severity of the Crimes at Issue**

7            Defendant argues Plaintiff was violating the emergency curfew order; obstructing

8    police in violation of Phoenix City Code § 23-18, committing criminal trespass in violation

9    of Arizona Revised Statutes § 13-1502(A)(1), and committing riot under Arizona Revised

10   Statutes § 13-2903.  (*Id.*)  "A person commits riot if, with two or more other persons acting

11   together, such person recklessly uses force or violence or threatens to use force or violence,

12   if such threat is accompanied by immediate power of execution, which disturbs the public

13   peace."  Ariz. Rev. Stat. § 13-2903(A).

14           Defendant emphasizes that serious criminal activity, including vandalism, looting,

15   arson, attacks on critical infrastructure, and attacks on police took place from the start of

16   the rioting on May 28, 2020 and continued through May 31, 2020, when Plaintiff was

17   arrested.  (Doc. 266 at 35.)  Just 30 minutes before the Air Unit spotted Plaintiff and others

18   running in the alley toward Defendant's location at the traffic stop, rioters damaged

19   property and assaulted police nearby on 7th Street and Roosevelt.  (*Id.*; Def. Dep. at 121.)

20   Defendant stated he responded to this "riot on Seventh Street and Roosevelt . . . where

21   officers were assaulted, property was damaged," and he was aware individuals involved

22   were forced out of that area, leaving "several groups going in different directions."  (Def.

23   Dep. at 121.)  Defendant argues that, under these circumstances, "the government's interest

24   in preventing these crimes from continuing and/or increasing in severity was significant."

25   (Doc. 266 at 36.)

26           Plaintiff argues that Defendant's beliefs that he (1) committed an alleged curfew

27   violation, (2) disregarded Officer Tate's command to stop, and (3) was allegedly

28   ***attempting*** to jump a residential fence are "unsupported assertions."  (Doc. 276 at 13−14

(emphasis in original).)  Plaintiff also argues that the alleged offenses are misdemeanors, and "[t]he fact that Plaintiff Saccoccio was suspected of having committed, at most, a misdemeanor, weighs heavily against Defendant Gomez's use of a potentially lethal chemical impact projectile." (*Id.*)

Any argument that Defendant had no reason to suspect Plaintiff of violating curfew fails.  Plaintiff does not dispute the encounter in the alley occurred after 9:00 p.m., more than one hour past the 8:00 p.m. curfew.  Nor does he dispute that, at that time, police were actively trying to disperse or arrest groups of people breaking curfew, including those engaged in violent criminal activity.

A reasonable officer could have likewise inferred Plaintiff was obstructing police. Plaintiff does not dispute, and the video evidence confirms, that Officer Tate issued several commands for those in the alley to stop, and Plaintiff failed to stop and instead began to climb a residential fence.  Plaintiff attempts to discount Officer Tate's commands, arguing that, when he first yelled, "Stop, stop, right there," he was 25 feet away from Plaintiff, did not specifically direct his order at Plaintiff, and admits he was unable to confirm that Plaintiff heard the order or understood it was directed at him instead of at someone else. (*Id.* at 6.)  Plaintiff does not claim, though, that he did not hear Officer Tate's commands or know they were directed at him.  Moreover, the proper inquiry is not whether Plaintiff heard and understood Officer Tate's commands but what a reasonable officer on the scene would have believed.  A reasonable officer experiencing what was taking place in the alley could have reasonably believed Plaintiff heard and understood Officer Tate's repeated commands to stop and failed to comply.  Similarly, there is no dispute Plaintiff started to climb a residential fence, so Defendant could have reasonably believed he was committing or about to commit criminal trespass.  Criminal trespass is defined as "[k]nowingly entering or remaining unlawfully on any real property after a reasonable request to leave by a law enforcement officer."  Ariz. Rev. Stat. § 13-1502(A)(1).

Finally, a reasonable officer in Defendant's position could have reasonably believed that those in the alley, including Plaintiff, either committed or intended to commit a riot.

As noted, "[a] person commits riot if, with two or more other persons acting together, such person recklessly uses force or violence or threatens to use force or violence, if such threat is accompanied by immediate power of execution, which disturbs the public peace."  Ariz. Rev. Stat. § 13-2903(A).  Even though Defendant did not observe Plaintiff with a weapon or incendiary device or see him engage in criminal damage or violence toward police, Defendant knew that, over the previous three nights, peaceful protests turned violent, and groups were agitating online for people to come to the protests and riot.  Defendant also knew that 30 minutes prior to the alley encounter, individuals at 7th St. and Roosevelt were engaged in vandalism and assaulting police, various groups began dispersing from that location, and many were spotted evading and running from police.  The Air Unit also warned Defendant and his fellow officers that a group was coming through the alley toward where they were attempting to detain six individuals suspected of assisting in the riots.  A reasonable officer knowing these facts could have reasonably inferred that the individuals spotted by the Air Unit had engaged in or intended to engage in criminal activity.  *Cf. Edgerly v. City & Cnty. of San Francisco*, 599 F.3d 946, 953 (9th Cir. 2010) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)) (alterations in original) ("To determine whether the Officers had probable cause at the time of the arrest, we consider 'whether at that moment the facts and circumstances within [the Officers'] knowledge . . . were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense'").  Moreover, police officers can arrest a group or crowd of people based on reasonable suspicion that a crime has been or is being committed, even when that suspicion is not particularized to each individual.  *See Lyall v. City of Los Angeles*, 807 F.3d 1178, 1194 (9th Cir. 2015) (acknowledging that police officers can have probable cause to arrest a group or crowd of people without individualized suspicion as to each person in the group).

Plaintiff's argument that the crimes were only misdemeanors does not apply to riot, which is a class 5 felony.  *See* Ariz. Rev. Stat. § 13-2903(B).  But even if, as Plaintiff argues, Defendant lacked sufficient facts to reasonably suspect him of participating in a riot, there was nonetheless a significant government interest at stake in stopping and

detaining Plaintiff and the other suspects in the alley.  Viewed together and in the context of the past three nights of civil unrest, Plaintiff's breaking curfew, obstructing police, and criminal trespass are enough to make this showing.  Though misdemeanors, these crimes occurred within a larger context of sustained criminal conduct and evince a greater government interest in stopping suspected violators than mere isolated or inadvertent violations.  *Bray*, 506 U.S. at 287 ("persistent, organized, premeditated lawlessness menaces in a unique way the capacity of a State to maintain order and preserve the rights of its citizens").

### 3.    Whether Plaintiff Posed a Threat

When Defendant first became aware the Air Unit had spotted a group in the alley coming towards the traffic stop, Defendant reasonably perceived the group as a threat.  He stated he believed:

> they could hurt us. They could throw stuff at us just like it has been the last three days prior to that.  They could throw rocks at us.  They could throw bottles at us.  They could have weapons. ·They could shoot us.· They could shoot fireworks at us.· They could shoot incendiary devices at us.· I am trying to figure out how not to get killed, and how not to get my partners killed and trying to focus my attention on several different things at one time and listen to everything at one time and trying to figure all that out in my mind at a moment's notice.

(Def. Dep. at 112:24−113:9.)  Minutes later, when Plaintiff failed to stop at Officer Tate's commands and started climbing the fence, Defendant no longer considered him a threat to the officers, but he believed Plaintiff posed a threat to civilians and homeowners.  (*Id.* at 94:15−23.)  This belief was based, in part, on Defendant's knowledge that the group in the alley:

> were still out past curfew and they were all − they were evading police.· They were running from the police.· They were running from the air unit [and] not obeying commands from an officer telling them to stop, and then . . . tried to get into a fenced residential yard.

(*Id.* at 123:1−7.)

1    Though Defendant admits there was no immediate threat to the officers when
2    Plaintiff began climbing the residential fence, a reasonable officer in Defendant's position
3    could have reason to believe Plaintiff posed an ongoing threat to the officers or the public
4    if he was able to flee.

### 4.    Whether Plaintiff was Resisting Arrest

6    The undisputed facts support that Plaintiff was resisting arrest.  Plaintiff was in the
7    alley after curfew with a group coming toward police, and he failed to comply with Officer
8    Tate's commands to stop and instead began climbing a fence away from police.  Plaintiff
9    argues he was not actively attempting to evade arrest by flight because there is no evidence
10   any officer stated he was under arrest.  (Doc. 276 at 15.)  The fluidity of the circumstances
11   render this explanation nonsensical.  Plaintiff does not dispute that Officer Tate repeatedly
12   shouted to stop, and Plaintiff failed to stop.  For Fourth Amendment purposes, an arrest or
13   "seizure" occurs "when the officer by means of physical force or show of authority
14   terminates or restrains [a suspect's] freedom of movement through means intentionally
15   applied." *Nelson v. City of Davis*, 685 F.3d 867, 875 (9th Cir. 2012) (quoting *Brendlin v.*
16   *California*, 551 U.S. 249, 254 (2007).)  Officer Tate's "stop" commands, followed by the
17   deployment of pepper balls, were intentionally done to terminate Plaintiff's movement.  He
18   was not required to use the word "arrest."  A reasonable officer on the scene could have
19   reasonably inferred from Plaintiff's actions that he was resisting arrest.

20   Combined with the above factors, including the government's legitimate interest in
21   dispersing lawbreakers and restoring order, there was a substantial government interest at
22   stake in arresting Plaintiff.  *Felarca*, 891 F.3d at 818, *Forrester*, 25 F.3d at 807.

### C.    Whether the Force Used was Reasonable[7]

24   Finally, the Court must assess "the nature and quality of the intrusion on [Plaintiff's]
25   Fourth Amendment interest against the countervailing governmental interests." *Graham*,

---

27   [7] As noted by Defendants, Plaintiff's earlier allegation that he was shot at "point-
28   blank range" has now been significantly modified.  He now concedes that Defendant
     deployed the impact round "from behind the sidewalk where he was conducting the traffic
     stop, approximately 100 feet" from him.  *See* Doc. 283 at 4-5 n.1) *citing* (Doc. 276 at 5-6).

490 U.S. at 395.  "Ultimately, we must balance the force that was used by the officers against the need for such force to determine whether the force used was 'greater than is reasonable under the circumstances.'"  *Espinosa*, 598 F.3d at 537 (quoting *Santos*, 287 F.3d at 854).

Defendant argues that the force used was reasonable because the government interest in quickly detaining Plaintiff and preventing him from entering residential property as part of restoring order outweighs the intrusion on Plaintiff's rights.  (Doc. 266 at 39.)  Insofar as Plaintiff's arm fracture suggests this use of force was unreasonable, Defendant argues that the existence of an unanticipated injury "does not transform a reasonable response into an unreasonable response or make him strictly liable for an unanticipated injury."  (*Id.* at 39−40 (quoting, e.g., *Wallace v. City of Shelby*, 968 F. Supp. 1204, 1211 (N.D. Ohio 1997)).)

In *Wallace*, the arresting officer used a leg-sweep to take down a resistant suspect, but the officer slipped during the take-down, causing the suspect to hit the ground face first and injure her face.  *Id.* at 1206.  The court found the take down was justified and the plaintiff's unanticipated injuries did not alter the reasonableness of that use of force.  *Id.* at 1210−11; *see also Pullin v. City of Canton*, 133 F. Supp. 2d 1045, 1053 (N.D. Ohio 2001) (unanticipated injuries caused by an arrestee's resistance during handcuffing did not make the officer's use of force unreasonable.)

Defendant also argues that, because he was conducting a traffic stop with six individuals when Plaintiff resisted Officer Tate's commands, he did not have the option of using hands-on force to prevent Plaintiff from fleeing into a residential yard, so his use of an OC impact round designed for pain compliance, when distance is a factor, was reasonable.  (Doc. 283 at 12−13.)

Plaintiff counters that this use of force was unreasonable because Defendant did not attempt any less intrusive alternatives or warn Plaintiff he would be shot with an impact round.  (Doc. 276 at 12.)  Based on the officers' bodycam videos, Plaintiff argues that only 8 seconds elapsed from when Officer Tate first yelled "Stop, stop right there" and

Defendant shot Plaintiff. (*Id.*)[8] From this, Plaintiff argues that "no reasonable alternatives to force were attempted because the first and only reaction of Defendant [] was to shoot an impact round at Plaintiff [], who had very little time to comprehend and comply with any officer requests, or to make officers aware that he meant no harm." (*Id.*) Plaintiff also argues that "the potency and potential lethality of the 40-millimeter impact round . . . weighs against Defendant's use of force. (*Id.*) Plaintiff relies on *Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001), for the proposition that "[l]ess than deadly force that may lead to serious injury may be used only when a strong governmental interest warrants its use, and in such circumstances should be preceded by a warning, when feasible." (*Id.*)

In *Deorle*, deputies responded to the home of a mentally disturbed individual (Deorle) who was acting erratically and threatening suicide. *Id.* 272 F.3d at 1278. Deorle was walking on his own property carrying a bottle or can when, without warning, an officer shot him with a "less lethal" lead-filled, cloth-cased projectile akin to a rubber bullet. *Id.* 272 F.3d at 1278−1281. The projectile struck Deorle in the face, lodged in his skull, and caused several cranium fractures and the loss of his left eye. *Id.* at 1281. Under these circumstances, the Ninth Circuit held that,

> Shooting a person who is making a disturbance because he walks in the direction of an officer at a steady gait with a can or bottle in his hand is clearly not objectively reasonable. Certainly, it is not objectively reasonable to do so when the officer neither orders the individual to stop nor to drop the can or bottle[] and does not even warn him that he will be fired upon if he fails to halt.

*Id.* at 1284. The court stated that the absence of a warning influenced its finding, but it clarified that it "d[id] not hold . . . that warnings are required whenever less than deadly force is employed." *Id.* Instead, it stated, "such warnings should be given, when feasible,

---

[8] Plaintiff elsewhere argues there was a 9-second gap. (Doc. 276 at 6.) As noted, the bodycam evidence is hard to make out and does not show when Defendant shot Plaintiff. Nonetheless, the Court infers in Plaintiff's favor that he did so 8−9 seconds after Officer Tate yelled stop.

1   if the use of force may result in serious injury, and [] the giving of a warning or the failure

2   to do so is a factor to be considered in applying the *Graham* balancing test." *Id.*

3        The facts in *Doerle* are not sufficiently like those here to show that Defendant's

4   failures to issue a warning or wait longer for Plaintiff to comply with an officer's

5   commands were objectively unreasonable. Inferring that Defendant shot an OC impact

6   round at Plaintiff approximately 8−9 seconds after he was told to stop, Plaintiff does not

7   dispute he failed to stop and instead began climbing a residential fence. There can be no

8   genuine dispute that, since Plaintiff had time to take these evasive actions, he had time to

9   respond to Officer Tate's multiple stop commands but instead attempted to flee. Under

10  these circumstances, a reasonable officer would have no reason to believe additional

11  commands or warnings would stop Plaintiff.

12       There is also no genuine dispute that, at this time, Officer Tate was confronting

13  multiple suspects in the alley, and Defendant was separately occupied with six other

14  suspects from the truck. So, Defendant did not have any reasonable means to try to stop

15  Plaintiff using lesser, hands-on force. Defendant's choice to deploy an OC impact round

16  from a distance was therefore objectively reasonable. "[T]he right to make an arrest . . .

17  necessarily carries with it the right to use some degree of physical coercion or threat thereof

18  to effect it." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 22–27 (1968)).

19       The OC round used here was also far less intrusive than the cloth-covered lead

20  munition "calculated to stop 'people who are violent or hostile and are threatening injury

21  or death to themselves or others'" in *Deorle*. 272 F.3d at 1279. Even though, if aimed at

22  the head/neck or shot from less than 5 feet away, an OC impact round can cause serious

23  injury or death, no such use occurred here. Instead, Defendant shot at a proper target area

24  of the body from 100 feet away. Defendant had no reason to believe this use of force would

25  cause anything more than temporary pain and potential bruising. Thus, even if he had time

26  to issue a warning, *Deorle*'s admonition that "warnings should be given, when feasible, if

27  the use of force may result in serious injury," does not apply. 272 F.3d at1284. For the

28  reasons already discussed, Plaintiff's unanticipated injury does not change this conclusion.

*See Santos*, 287 F.3d at 855 (amount of force used cannot always be reasonably deduced from the extent of injury); *Wallace*, 968 F. Supp. at 1211 (unexpected injury does not alter use of force analysis).

Plaintiff also argues that Defendant's use of force was unreasonable because Plaintiff was not posing a threat. Plaintiff relies on *Nelson*, 685 F.3d at 881, for the proposition that "general disorder . . . cannot be used to legitimize the use of pepper ball projectiles against non-threatening individuals." (Doc. 266 at 14.)

In *Nelson*, police responded to an apartment complex during a widely promoted 1,000-person student party. 685 F.3d at 872. As the party progressed, some partygoers parked illegally, blocked streets, engaged in underage drinking, broke bottles, and rocked a car, and the apartment owner called police to break up the party and order the non-resident trespassers to leave. *Id.* at 872−73. After giving unamplified verbal dispersal orders that proved ineffective over the noise of the party, a group of officers dressed in riot gear and armed with pepper ball guns entered a breezeway, described as a "very narrow, confined space," where fifteen to twenty students were attempting to leave. (*Id.* at 873−74.) Even though the students asked the officers what they wanted them to do and raised their hands, showing a willingness to comply, the officers did not instruct the students how to leave. Instead, they followed a supervisor's order to "disperse them," and shot pepper balls indiscriminately into the group. (*Id.* at 874.)

In finding that the officers could not have reasonably believed the group posed a threat, the Ninth Circuit reasoned,

> Although the officers encountered individuals at various points during their sweeps who threw bottles or other debris at them, or haphazardly threw such items throughout the complex, the defendants admit that they never saw Nelson throw anything— in their direction or in any other direction. The same is true of the other students gathered with Nelson in the breezeway. More than one of the defendant officers stated in their depositions that they did not see anyone in Nelson's group throwing bottles or engaging in any other threatening or dangerous behavior. Additionally, the officers did not have a reasonable belief that Nelson or his friends had engaged in

> violent behavior or that he or the students on the breezeway with him might do so absent the officers' intervention by force.

*Id.* at 880.

*Nelson* involved only a raucous student party at an apartment complex, not a culmination of four nights of public unrest resulting in a statewide curfew. The facts leading up to Defendant's use of force also materially differ from those in *Nelson*. In *Nelson*, the officers had no reason to suspect the departing students in the breezeway were participating in any criminal acts or assaults on police, or to draw any connection between those students and those who had engaged in these actions during earlier sweeps of the property. Here, a reasonable officer in Defendant's position could infer from the totality of the circumstances that Plaintiff was involved in or contributing to the public unrest because he was out over one hour past a statewide curfew imposed due to civil unrest, was amongst a group coming through an alley in the vicinity of recent violence from which groups had dispersed, and he was seen running from police while failing to comply with Officer Tate's orders. Unlike the officers in *Nelson*, a reasonable officer facing these facts could believe Plaintiff and the others in the alley "had engaged in violent behavior" or "might do so absent the officers' intervention by force." 685 F.3d at 880.

Additionally, unlike *Nelson*, where students evinced compliance, and the officers provided no instruction before firing pepper balls, Officer Tate loudly and repeatedly yelled out orders, and Plaintiff ignored these orders and started climbing a residential fence. Defendant also did not fire his OC launcher indiscriminately into the alley or in a manner likely to cause serious injury. Instead, he aimed at and struck an acceptable target-area of Plaintiff's body designed for pain compliance. Plaintiff then got up on his own accord and walked with the officers. When it appeared he was injured, Defendant called the fire department. *Cf. Nelson*, 685 F.3d at 874 (after an indiscriminately fired pepper ball struck Nelson in the eye, causing him to writhe on the ground in pain, officers proceeded past him and failed to render aid).

In summary, a reasonable officer experiencing the escalation in violence over three

1    nights of civil protests which  included groups throwing objects at police, lighting fires,

2    setting off incendiary devices, and damaging property, could  have reasonably inferred that

3    the group in the alley had engaged in or would engage in similar acts if permitted to escape.

4    Under the fluidity of these circumstances, Defendant when confronted by a group of

5    protesters, including Plaintiff, who were earlier occupying streets in violation of an

6    emergency curfew order and evading police, could reasonably infer that Plaintiff had

7    engaged in or would engage in ongoing  acts of destruction and disobedience.  There was,

8    therefore, a substantial government interest at stake in arresting them.  Accounting for these

9    facts and making allowance for police officers' need to make split-second decisions in

10   rapidly evolving situations, it was not objectively unreasonable for Defendant to use

11   minimal to moderate force to stop and detain Plaintiff.  Defendant is entitled to summary

12   judgment on Plaintiff's Fourth Amendment claim.

13                **D.    Qualified Immunity**

14        In the alternative, Defendant argues he is entitled to qualified immunity because it

15   was not clearly established on May 31, 2020 that his use of force violated Plaintiff's

16   constitutional rights.  (Doc. 266 at 41.)  The Court agrees.

17        Government officials are entitled to qualified immunity from civil damages unless

18   their conduct violates "clearly established statutory or constitutional rights of which a

19   reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

20   In deciding if qualified immunity applies, the Court must determine: (1) whether the facts

21   alleged show the defendant's conduct violated a constitutional right; and (2) whether that

22   right was clearly established at the time of the violation.  *Pearson v. Callahan*, 555 U.S.

23   223, 230–32, 235–36 (2009) (courts may address either prong first depending on the

24   circumstances in the particular case).  In the qualified immunity analysis, the court must

25   consider all disputed facts in the light most favorable to the nonmovant.  *Isayeva v.*

26   *Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017).

27        For a right to be clearly established there need not be a case directly on point;

28   however, "existing precedent must have placed the statutory or constitutional question

1    beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*,

2    577 U.S. 7, 12 (2017)). Clearly established law "must be particularized to the facts of the

3    case," and "should not be defined at a high level of generality." *White*, 137 S. Ct. at 552

4    (quotation and citation omitted). A right is clearly established when case law has been

5    "earlier developed in such a concrete and factually defined context to make it obvious to

6    all reasonable government actors, in the defendant's place, that what he is doing violates

7    federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (citing

8    *White*, 137 S. Ct. at 551). Therefore, regardless of whether the constitutional violation

9    occurred, the officer should prevail if the right asserted by the plaintiff was not "clearly

10   established" or the officer could have reasonably believed that his particular conduct was

11   lawful. *Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991).

12        Once the right is defined, the court must then "identify a case where an officer acting

13   under similar circumstances as [the defendant] was held to have violated" that right.

14   *Shafer*, 868 F.3d at1117. If there is no such case, then the right was not clearly established.

15   *See id.* at 1117−18. "This is not to say that an official action is protected by qualified

16   immunity unless the very action in question has previously been held unlawful, but it is to

17   say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*,

18   536 U.S. 730, 739 (2002) (internal citations omitted). "The Supreme Court has made clear

19   that 'officials can still be on notice that their conduct violates established law even in novel

20   factual circumstances.'" *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (quoting

21   *Hope*, 536 U.S. at 741). This principle is particularly relevant "in the context of Fourth

22   Amendment cases, where the constitutional standard—reasonableness—is always a very

23   fact-specific inquiry." *Id.*; *see Drummond v. City of Anaheim*, 343 F.3d 1052, 62 (9th Cir.

24   2003) (holding that "no federal case directly on point [was needed] to establish" that the

25   conduct at issue violated clearly established law and constituted excessive force).

26        Defendant argues that, at the time, no Supreme Court or Ninth Circuit precedent

27   established that a 40-millimeter OC impact round was anything but a pain compliance

28   tool. (Doc. 266 at 43.) Defendant further argues that *Forrester* clarifies that using pain

- 30 -

compliance tools on demonstrators who fail to comply with verbal commands is reasonable. (*Id.*) He argues that, even if a 40-millimeter OC impact round is a higher degree of force than pain compliance, there is no case law that would have put him on notice that using this type of force to prevent Plaintiff from scaling a fence into a residential yard exceeded constitutional bounds. (Doc. 266 at 43−44.) Defendant argues that, as of May 2020, there was not a single Supreme Court or Ninth Circuit decision addressing the use of 40-millimeter OC impact rounds. (*Id.* at 44.)

The lack of legal precedent on OC impact rounds does not mean Defendant is entitled to qualified immunity. For a right to be firmly established, "[w]e do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, (2011) Defined with particularity, the right at issue here is the right of an individual breaking curfew, resisting arrest, and attempting to flee in an area where recent rioting has taken place not to be shot at with a projectile designed for pain compliance, resulting in an arm fracture. Cases addressing analogous uses of force under analogous circumstances can show whether a reasonable officer in Defendant's position would have known that this use of force was unconstitutional. *Mattos*, 661 F.3d at 442; *Hope*, 536 U.S. at 741.

*Forrester* provides an apt comparator because it, too, involved a group of demonstrators/protesters committing minor crimes, including trespassing, obstructing police, and passively resisting arrest. 25 F.3d at 806. The nunchakus, pressure point holds, and arm twists the officers used were likewise designed for pain compliance but capable of causing at least minor injuries. *Id.* at 805−806. Though the arrestees complained of "varying degrees of injury to their hands and arms, including bruises, a pinched nerve, and one broken wrist," the court held that "police officers did not use excessive force by applying pain compliance techniques to arrest the demonstrators" who were blocking a health clinic and refusing verbal commands to leave. 25 F.3d at 806-809. *Forrester* would not have placed a reasonable officer in Defendant's position on notice that Defendant's use of force was objectively unreasonable.

1    Plaintiff relies on three other cases, *LaLonde v. Cnty. of Riverside*, 204 F.3d 947

2  (9th Cir. 2000), *Deorle,* and *Nelson*, which the Court already discussed, to argue it was

3  clearly established at the time that Defendant's use of force was unconstitutional.

4  (Doc. 276 at 18–20.)

5    In *LaLonde*, police responded to a private residence to investigate a neighbor's noise

6  complaint.  204 F.3d 951.  The officers confronted the homeowner (LaLonde) in the

7  doorway of his home, who refused to come out or allow the officers to come inside.  204

8  F.3d at 951.  The officers entered the residence and attempted to arrest LaLonde for

9  obstructing an investigation, but LaLonde refused to submit to handcuffs, so the officers

10  knocked him to the floor and sprayed pepper spray in his face. *Id.* at 951–52.  The officers

11  then handcuffed him and left him on a couch for 20–30 minutes while the pepper spray

12  burned—causing redness around his eyes and tears and mucus to run from his eyes and

13  nose—and grew increasingly painful, "like [his face] was on fire." *Id.* at 952.  The Ninth

14  Circuit did not address the officers' initial use of pepper spray, but it held the officers were

15  not entitled to qualified immunity because they failed to alleviate its effects. *Id.* at 961.  It

16  reasoned that, "in a situation in which an arrestee surrenders and is rendered helpless, any

17  reasonable officer would know that a continued use of the weapon or a refusal without

18  cause to alleviate its harmful effects constitutes excessive force." *Id.* at 961.

19    *LaLonde* would not have put a reasonable officer in Defendant's position on notice

20  that using a correctly deployed OC impact round to stop Plaintiff, then calling for aid as

21  soon as it appeared Plaintiff was injured, was a Fourth Amendment violation.  Even if, like

22  LaLonde, Plaintiff was only suspected of minor crimes and resisting arrest, the government

23  interest in stopping and detaining him as part of restoring order during a widespread public

24  riot was more significant than the government interest in investigating a single residential

25  noise complaint.  Additionally, the force Defendant used to stop and detain Plaintiff bears

26  little resemblance to spraying pepper spray directly into a suspect's face and leaving it to

27  burn for 20–30 minutes.  The only similarity is that an OC impact round, like pepper spray

28  or pepper balls, contains oleoresin capsicum.  But there is no evidence an OC impact round

that hits a suspect's arm has the same effect as pepper spray directed at a suspect's eyes and face.  Plaintiff also does not claim he suffered any pepper spray effects.  *LaLonde* would not have "made it obvious to all reasonable government actors, in the defendant's place, that [Defendant's use of force] violates federal law." *Shafer*, 868 F.3d at 1117.

Plaintiff additionally relies on *Deorle* and *Nelson*.  He argues that the OC impact round Defendant used was "a combination of the munitions used in *LaLonde* (pepper spray) and *Deorle* (an impact projectile)" and was "only a slightly different form of the sort of munition that was used (and explicitly disapproved of) by *Nelson*." (Doc. 276 at 19.)

In *Deorle*, the Ninth Circuit determined the officer who shot a lead-filled munition at a mentally disturbed individual who was merely walking briskly toward the officer in his own yard was not entitled to qualified immunity.  272 F.3d at 1276−77.  The court reasoned that

> [e]very police officer should know that it is objectively unreasonable to shoot—even with lead shot wrapped in a cloth case—an unarmed man who[] has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals.

*Id.* at 1285.

*Deorle* did not involve multiple suspects out after curfew, resisting arrest, and attempting to flee in an area where rioting had occurred and was yet uncontained.  Instead, Deorle was on his own property, was not attempting to flee, and, in case he tried to do so, the officers had placed roadblocks around the house to prevent his escape.  *Id.* at 1277.  Additionally, the officers had already interacted with Deorle for 30−40 minutes, and Deorle generally complied with their commands, so there was little cause to believe he posed a threat.  *Id.*  Finally, unlike here, where Officer Tate repeatedly ordered Plaintiff to stop and Plaintiff failed to, the officer in *Deorle* never commanded Deorle to stop before shooting him with potentially lethal force.  *Id.* at 1277−78.

The only similarity between the circumstances confronting Defendant and those confronting the officers in *Deorle* is that Plaintiff did not pose an immediate threat to the officers when he started climbing the residential fence.  As discussed, however, a reasonable officer could have reasonably inferred that the group spotted in the alley, including Plaintiff, had participated in rioting and would endanger the officers or the public if permitted to escape.  Police had not yet secured the area or contained the potential threat.  Rather, when Plaintiff attempted to flee, Defendant and his fellow officers were outnumbered by groups of people breaking curfew, committing acts of violence, and fleeing from police.

The type of projectile used here was also not substantially similar to the lead-filled projectile fired from a shotgun in *Deorle*.  By the officer's own admission in *Deorle*, that munition was "potentially lethal at thirty feet and could be lethal at distances up to fifty feet."  *Id.* at 1279.  The officer admitted that "[t]he target area for lethal capabilities would probably be the facial area[, and] if it impacted at the heart it could stop the heart or possibly tear a vital artery."  *Id.* (alterations in original).  Nonetheless, he "shot at Deorle's torso from thirty feet," and "the round hit Deorle in the head and removed his left eye and lodged pieces of lead shot in his skull."  *Id.*  Although a 40-millimeter OC impact round may likewise cause serious injury or death if used improperly, the specifications for its use only warn against shooting from less than 5 feet away or aiming at the head, neck, or spine.  By this measure, this projectile had far less injurious capabilities than the lead projectile used in *Deorle*.  *Deorle* would not have placed Defendant on notice that shooting Plaintiff in the arm with an OC impact round from 100 feet away was unconstitutional.

*Nelson* also did not firmly establish that this use of force was unconstitutional.  There, the Ninth Circuit stated that,

> The dual nature of the pepper ball projectile creates additional risks not present with a strictly projectile object, as used by the officer in *Deorle.*  Nonetheless, even if considered as a purely projectile object, the officers in this case were aware that pepper balls fired from their guns could, as in this instance, cause substantial harm, and that there was a substantial risk of

1

2

> hitting individuals in vulnerable areas given the inability to accurately target their weapons at the distance at which they fired them.

3    685 F.3d at 885.

4       Plaintiff's failure to heed Officer Tate's repeated commands and his attempt,

5    instead, to flee police by climbing a residential fence starkly contrast with the students acts

6    in *Nelson*, who asked police for direction and raised their arms in compliance.  The type

7    and amount of force used, and the resulting injury, are likewise dissimilar.  Defendant shot

8    a single OC impact round at an acceptable target area; whereas, in *Nelson*, the officers fired

9    a barrage of pepper balls indiscriminately on an entire group without regard to whom they

10   hit or where in the body they hit them.  As a result, a pepper ball struck one of the students

11   (Nelson) in the eye, causing significant eye damage, temporary blindness, and a permanent

12   loss of visual acuity.  Nelson "also was forced to endure multiple surgeries to partially

13   repair the damage caused by the pepper ball projectile." *Id.* at 879.  *Nelson* would not have

14   placed Defendant on notice that a single, properly deployed OC round aimed at an

15   acceptable target area of the body was unconstitutional.

16      So, the above cases do not firmly establish that an individual who is violating

17   curfew, resisting arrest, and attempting to flee over a residential fence in an area of recent

18   rioting has a right not to be shot in the arm with a 40-millimeter impact round from 100

19   feet away.  Plaintiff's injury—a fractured bone shaft requiring surgery—was undoubtably

20   serious, but it did not rise to the level of the injuries inflicted by the lead-filled bean bag

21   munition in *Deorle* or the indiscriminate firing of pepper balls in *Nelson*, both of which hit

22   subjects in the face, causing, among other injuries, the loss of an eye or permanent eye

23   damage.  On balance, Plaintiff's injury was more akin to the lesser injuries—including a

24   broken wrist—in *Forrester*, in which the Ninth Circuit found the force used was

25   reasonable.   Absent a case where "an officer acting under similar circumstances as

26   [Defendant] was held to have violated" the right at issue, the right was not clearly

27   established, and Defendant is entitled to qualified immunity.  *Shafer*, 868 F.3d at 1117.

28      Alternatively, even if every reasonable officer in Defendant's position would have

known that using force capable of breaking Plaintiff's arm was unreasonable, Defendant is entitled to qualified immunity because he had no reason to believe the OC impact round would have this effect, and he could have reasonably believed this use of force was lawful. *See Romero*, 931 F.2d at 627 ("regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not "clearly established" or the officer could have reasonably believed that his particular conduct was lawful").

There is no evidence Defendant was aware from his training, past experiences as a TRU officer, manufacturer specifications, or any other known facts prior to Plaintiff's injury that a properly deployed OC impact round would cause anything more than pain and potential bruising. At most, Defendant made a reasonable mistake of fact about the level of injury Plaintiff would suffer. But this is not enough to subject him to liability for an alleged constitutional violation where his conduct was otherwise reasonable in relation to the government interests at stake. "Qualified immunity balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from . . . . liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. This protection applies "regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (internal citation omitted). "Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Rico v. Ducart*, 980 F.3d 1292, 1298 (9th Cir. 2020) (internal quotation marks and citation omitted). These principles apply here.

/ / / /
/ / / /
/ / / /
/ / / /
/ / / /
/ / / /
/ / / /

For the above reasons, even if a constitutional violation took place, Defendant is entitled to qualified immunity.  The Court will grant summary judgment to Defendant.

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is **withdrawn** as to Defendant's Motion for Summary Judgment (Doc. 266).

(2)    Defendant's Motion for Summary Judgment (Doc. 266) is **granted**, and the action is terminated with prejudice.  The Clerk of Court must enter judgment accordingly.

Dated this 16th day of December, 2024.

_____
Honorable Diane J. Humetewa
United States District Judge